**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>LONNIE LILLARD, *et al.*,<br><br>    Defendants. | 2:06-cr-00291-PMP-LRL<br><br>**MOTION TO SUPPRESS (#52)** |

**REPORT & RECOMMENDATION**

The defendant, Lonnie Lillard, is awaiting trial on charges of wire fraud in violation of 18 U.S.C. § 1343, and conspiracy to produce, traffic in, and use counterfeit and unauthorized access devices in violation of 18 U.S.C. § 1029(b)(2). Lillard has filed a Motion to Suppress (#52), which addresses the circumstances surrounding his arrest and the search of guest rooms 26006 and 27050 at the Treasure Island Hotel and Casino. Lillard contends that his arrest and the subsequent search of his room were conducted without probable cause; that the failure of the officers to knock and announce their presence and purpose requires suppression of all evidence found in room 27050; that the circumstances did not justify a protective sweep of the room; that the initial warrantless entry into room 27050 was not justified by exigent circumstances; and that evidence seized from his rented Chrysler 300 and room 27050 should be excluded under the fruit of the poisonous tree doctrine. Finally, he contends that the affidavit supporting the search warrant for the Chrysler 300 falsely stated that he was using the alias "Rahman Johnson," which undermined the validity of the warrant. The government contends that law enforcement properly secured room 27050 while they sought and obtained a search warrant; that the evidence seized in room 27050 was seized pursuant to a valid warrant; and that the search of the Chrysler 300 was not tainted.

An evidentiary hearing was held on June 12, 2007. Assistant United States Attorney Timothy Vasquez appeared for the government and Attorney John McNicholas appeared for Lillard. The government called Detective Kim Thomas. Lillard testified on his own behalf. The police version of what occurred is somewhat at odds with the version offered by Lillard. However, the discrepancies are inconsequential to the issues here.

**THE EVIDENCE**

On July 27, 2006, law enforcement began investigating a report that fraudulent refund transactions from a merchant credit card terminal were received from telephone number (702) 894-7111. This is the telephone number of the Treasure Island. Law enforcement agents went to the Treasure Island and determined from a hotel employee that the calls were placed from guest room 26006. Rahman Johnson was the name under which the room had been procured.

Based on the information obtained by law enforcement, a state court judge issued a warrant authorizing search of room 26006 at the Treasure Island. Pursuant to the warrant, law enforcement officers found a merchant credit card terminal, a card encoder connected to a laptop computer, various paraphernalia common to a forgery lab, and a Washington State driver's license #4UACE250MM under the name Lonnie Eugene Lillard.

Detective Thomas testified that some of the evidence seized in room 26006 led him to believe a second room was involved. Using the name on the newly discovered driver's license, Lillard was run through Triple III, the FBI database. It was learned that Lillard has an extensive criminal history that includes forgery and counterfeiting crimes. Law enforcement cross referenced the hotel's guest information with the name Lillard and found that room 27050 was registered under that name. The hotel's player's card database also linked rooms 26006 and 27050. Given the overwhelming evidence that a forgery lab was operating out of Treasure Island and the additional information regarding Lillard, Detective Thomas decided to seek a search warrant for room 27050.

Detective Thomas testified that as he was sitting in room 26006 drawing up an affidavit and search warrant for room 27050, there was a knock on the door. When Special Agent Howell and

1  another detective opened the door after a short delay, they saw an individual walking away. It was
2  codefendant Dennis Bryant. When Bryant saw law enforcement officers, he fled. A foot pursuit began.
3  After a minute or so Detective Thomas and a hotel security guard went to find out what happened. They
4  learned that Bryant had made it out an emergency exit and onto a pedestrian bridge before he was
5  detained. Nearby, casino security personnel found an abandoned cell phone. Detective Thomas worried
6  that Bryant may have called his accomplices, if any existed.

7  In the meantime Detective Olewenski, who had remained in room 26006, answered a knock at
8  the door by three women later identified as Nadia Favro, Tanya Sarden, and Brittania Allen. Det.
9  Olewenski detained them and directed them to sit on the floor. When Detective Thomas returned to
10 room 26006, he *Mirandized* and questioned the women. When shown the Washington driver's license
11 in the name of Lonnie Eugene Lillard, Ms. Favro indicated that she knew the man in the picture as
12 Antoine. Ms. Favro stated that she and "Antoine" had come to Las Vegas together from Washington
13 State and were staying in room 27050. The three women also said that they had returned merchandise
14 for Lillard.

15 Detective Thomas testified that after learning of the cell phone found near Bryant and screening
16 the additional visitors to room 26006, he determined that the prudent course of action would be to
17 secure room 27050 to prevent the destruction or removal of any evidence and to prevent any suspects
18 therein from fleeing. In Detective Thomas' experience and training, items used in a forgery lab can be
19 easily sabotaged or destroyed. Hence, before he completed the affidavit in support of the search
20 warrant, Detective Thomas, accompanied by two Las Vegas Metropolitan Police Department bike
21 officers and an unspecified number of hotel security guards, went to room 27050 to secure any potential
22 evidence and suspects that may be located there.

23 **A. Police Version of Events Surrounding the Lock Out of Room 27050**

24 Detective Thomas testified that he knocked and announced before he entered room 27050,
25 consistent with his training. He was wearing a vest, a bright yellow raid jacket with the word "police"
26 on the back, and a badge, and was carrying a gun. The LVMPD bike officers were wearing their

standard uniform of bright yellow shirts and black shorts. Detective Thomas testified that as he entered the bedroom area of the hotel room, Lillard came out of the bathroom wearing a bathrobe. Detective Thomas handcuffed Lillard and checked the room for the presence of other suspects. None was found. Thomas asked Lillard for his identification. Lillard motioned to his wallet on the night stand. Incident to arrest, Thomas searched Lillard's wallet and found credit cards. Detective Thomas picked up a pair of pants from the floor, looked in the pockets but found nothing, and helped Lillard get dressed. Detective Thomas then had security lock out the room. He attested that he seized nothing from the room at that time and in his search warrant affidavit referenced nothing that was in plain sight in the room.

Detective Thomas escorted Lillard down to room 26006. When Lillard entered the room and saw the three females sitting on the floor he told them to keep their mouths shut and perhaps said something about acquiring an attorney. Bryant was also in the room, seated on the first bed. While Bryant, Lillard, and the three females were all in the room, co-defendant Byron Brown knocked on the door and was taken into custody.

**B.  Lillard's Version of the Events Surrounding His Arrest**

Lillard testified that he was dressed in boxer shorts, sitting on the bed listening to a compact disc when suddenly, without warning, the door to his hotel room opened and approximately five plainclothes officers entered his room yelling, "Police! Get your hands up! Search warrant!" The officers dragged him off the bed onto his belly and handcuffed him. When an officer asked for his identification, he indicated that it was on the table, inside his day planner. An officer grabbed a pair of pants and noted that there were cards in the pocket. Lillard does not remember having any type of cards in his pants' pocket, or if he did he does not remember which ones. He testified, however, that he did have approximately four room card-keys in his pocket. An officer put Lillard's pants on him, but did not grab a shirt. Instead the officer grabbed a bathrobe that was lying there and draped it over his shoulders. The officers were in the room approximately three minutes before they escorted him out of the room. He testified that while walking out of the room one of the officers told the others to look at the money

1 orders on the table. Lillard also testified that the officers escorted him to a freight elevator which they
2 took down to the 26th floor and walked him to room 26006.

3     According to Lillard, when he entered 26006 he was yelling that he wanted an attorney. One
4 of the officers answered, "Oh, Mr. Bigshot, you should have enough money to pay for an attorney." The
5 females were in the room, but Lillard testified that he didn't speak to them directly. In fact, he testified
6 that he learned their names only through the discovery provided by the government. Lillard testified
7 that Bryant was not in room 26006 when he arrived. He recalled, however, that codefendant Brown
8 knocked on the door when Lillard was in room 26006. Brown told the officers his name and provided
9 his identification, after which he was "backed up" into the vending machines where bags of
10 merchandise were removed from his hands.

11     Lillard testified that he sat in room 26006 for about fifteen minutes, after which he and Brown
12 were removed from room 26006 and taken to two separate rooms. Lillard testified that he recalled the
13 incident clearly because he was watching Fox News and he and Agent Howell had a discussion
14 regarding Agent Howell's career choice. Later, Lillard asked Detective Thomas what he was arrested
15 for and Detective Thomas indicated that because Lillard had requested an attorney he could not go into
16 the details of the case with him.

## DISCUSSION

**I. Warrantless Entry into Room 27050 Was Proper**

19     The Supreme Court has recognized that exigent circumstances will excuse the need for a warrant
20 and justify a warrantless entry into a dwelling. *See United States v. Jeffers*, 342 U.S. 48, 51 (1951).
21 Exigent circumstances are present when there is an urgent need to prevent evidence from being lost or
22 destroyed. *See Bailey v. Newland*, 263 F.3d 1022, 1033 (9th Cir. 1991) (citations omitted). "When
23 police officers seek to rely on this exception in justifying a warrantless entry, they must show an
24 objectively reasonable basis for concluding that the loss or destruction of evidence is imminent."
25 *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1512 (6th Cir. 1988) (citations omitted). The
26 subjective beliefs of the particular officers on the scene will not satisfy this standard if such beliefs are

5

unreasonable or unjustified. *Id.* (citation omitted).

The government bears a heavy burden in its effort to demonstrate an urgent need that justifies a warrantless entry. *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984). The case of *Segura v. United States*, 468 U.S. 796 (1984), provides considerable guidance in resolving the instant issue. Law enforcement agents arrested Segura in the lobby of his apartment building, entered his apartment without either permission or a warrant, conducted a limited security check to ensure that no one else was in the apartment who might pose a threat to their safety or to evidence, and then remained in the apartment for 19 hours until a search warrant was issued. *Id.* at 800–01. The Supreme Court stated that whether the initial entry was illegal or not is irrelevant to the admissibility of evidence that is seized later pursuant to an independently acquired warrant. The *Segura* court held that "securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Id.* at 810.

In the present case, the securing of room 27050 was less intrusive than that in *Segura*. First, Detective Thomas had a reasonable basis for entering room 27050 before the search warrant arrived. A cell phone was found in close proximity to an apparent accomplice, Bryant, and there was a lot of foot traffic in and around room 26006. It was reasonable that Detective Thomas, given his experience and training, believed that the loss of evidence was imminent based on the possibility that accomplices had been notified of or witnessed the police presence in and around room 26006. Lillard's argument that items used in a forgery lab can not be easily destroyed and thus the room could have been secured externally is not well founded. The magnetic strip on a credit or debit card is what has evidentiary value; that strip can be easily altered or destroyed. Moreover, computers may have internal booby traps that, when activated, can quickly erase any data that may be stored on the hard drive. Second, the evidence demonstrates that once agents entered the room their activities were limited to securing Lillard and locking out the room. These actions and Lillard's own testimony that the police were in the room for only three minutes are consistent with Detective Thomas' testimony that the sole purpose of entering room 27050 prior to obtaining a search warrant was to secure the room's contents and any additional

suspects. Lillard also testified that nothing was seized from the room, other than the cards contained in his wallet or planner, and, as he testified, the card-keys from his pants' pockets. Finally, officers did not stay in the room once it was cleared. Hotel security locked the room so that no other key card could gain entry. Such entry was not made until the search warrant was executed. For these reasons the court finds that the securing of room 27050 prior to obtaining a search warrant was proper.

Lillard also argues that if the evidence is not subject to suppression as primary evidence essentially seized by virtue of the initial illegal entry, the evidence should be excluded as "fruit" derived from that illegal entry. The court has found that the initial entry was legal, but whether it was legal or not is irrelevant to the admissibility of the challenged evidence because there was an independent basis for the warrant under which the evidence was seized. *See infra* Part III.

Lillard also contends that the circumstances surrounding the initial entry into room 27050 did not justify a protective sweep. The purpose of the entry was to secure and lock down the room in order to prevent the destruction or removal of evidence. It was clearly reasonable for the police to determine whether other persons besides Lillard were in the room.

Finally, Lillard alleges that in gaining initial entry into room 27050 the officers failed to knock and announce their identity and purpose. Based on the testimony adduced at the hearing, the court finds that the police did knock and announce as the law requires. Even if there had been a knock-and-announce violation, however, a lawful search nonetheless subsequently took place pursuant to a valid search warrant, the grounds for which, as noted below, were independent of the circumstances under which the initial entry into room 27050 was made. A violation of the knock-and-announce rule does not necessarily require suppression of the evidence found subsequent to the entry. *See Hudson v. Michigan*, ___ U.S. ___, 126 S.Ct. 2159, 2164 (2006). For evidence to be suppressible as a result of a knock-and-announce violation, the violation must have been the unattenuated, but-for cause of the obtaining of the evidence. *Id.* In other words, the acquisition of the evidence seized by the agents was not the "fruit of the fact" that the detectives allegedly failed to knock and announce their presence. *See id.* at 2169.

**II. The Arrest of the Defendant was Supported by Probable Cause**

A warrantless arrest must be based on probable cause. Probable cause to arrest is present when at the time of arrest, the officer has within his knowledge reasonably trustworthy facts and circumstances sufficient to warrant a reasonably prudent person to believe that the suspect has committed, is committing, or is about to commit a crime. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964); *see also Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The probable cause requirement does "not demand any showing that such a belief is correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).

Detective Thomas set forth the facts constituting probable cause to believe that Lillard had committed a crime. Specifically, Detective Thomas linked Lillard to the criminal enterprise through the females' statements that they had been returning merchandise to stores; Lillard's use of the name Antoine with the females; the presence of Lillard's identification at the forgery plant in room 26006; the link between rooms 26006 and 27050 under the hotel's player's card account; and Lillard's extensive criminal history of committing the same type of offenses. The court therefore concludes that probable cause existed to take Lillard into custody.

**III. The Search Warrant Affidavit for Room 27050**

Lillard alleges that Detective Thomas included in his affidavit certain observations made during the first (warrantless) entry into room 27050. He therefore contends that the warrant was not based wholly on information available to the officers before entry into the room. Thus, in Lillard's view, the evidence that was seized is tainted and must be excluded.

The court has found that both the securing of room 27050 and the arrest of Lillard were lawful. Absent those findings, the crucial inquiry simply would be whether the affidavit would contain probable cause to search room 27050 if the objectionable information were stricken. *See United States v. Vasey*, 834 F.2d 782, 788 (9th Cir. 1987) (citations omitted). The affidavit makes the following reference to items seized from room 27050 at the time Lillard was taken into custody:

> Lillard also had credit cards that were re-encoded with credit card

>   account information that was different than what was on the face of the credit cards he was carrying at the time of his detention. This information further tied room 26006 to room 27050.

Search Warrant Affidavit, Mot. (#52-3) at 6.

If this portion of the affidavit were excised, the warrant would still contain probable cause to search room 27050.

Probable cause for a search warrant requires that there be a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Here, the purported unexcised portion of the affidavit detailed the investigation into the forgery crime. (*See* Search Warrant Affidavit, Mot. (#52-3) at 4–6.) Detective Thomas itemized the forgery lab items seized from room 26006. Moreover, he linked the items to Lillard and room 27050 through Lillard's driver's license, Lillard's criminal history, the fact that room 27050 was registered to Lillard, and that rooms 26006 and 27050 were tied together under one player's card account. Under the totality of these circumstances, *see Illinois v. Gates*, 462 U.S. 213, 230 (1983), the court finds that the purported unexcised portion of the affidavit provided probable cause to search room 27050.

## IV. The Search Warrant Affidavit for the Chrysler 300

Lillard challenges the affidavit in support of a search warrant for a Chrysler 300 on the ground that Agent Howell recklessly and falsely represented that Lillard used the alias "Rahman Johnson" in renting room 26006.[1] The government concedes that the statement was inaccurate. (Opp'n (#53) at 3.) It argues, however, that the statement was based on a mistaken inference, not a deliberate or reckless disregard for the truth.

An accused may challenge the validity of an affidavit supporting a search warrant by demonstrating that the affidavit contains a false statement of fact that was made deliberately or with reckless disregard for the truth. *See Franks v. Delaware*, 438 U.S. 154, 170 (1978). The statement must also be necessary to the finding of probable cause. *Id.* at 156. If perjury or reckless disregard is

---

[1] Lillard's Motion also states that he was recklessly accused of posing as Rahman Johnson so that law enforcement could search room 27050. There was no representation made in this regard in the search warrant affidavit for room 27050. (*See* Search Warrant Affidavit, Mot. (#52-3).)

9

established by the defendant by a preponderance of the evidence, the court must void the search warrant if, after the false statement is set to one side, the affidavit's remaining content is insufficient to establish probable cause. *Id.*

Here, the affidavit inaccurately states that "[i]t was later determined that the individual posing as 'Rahman Johnson' was, in fact, Lonnie Lillard." (Search Warrant Affidavit for Chrysler, Mot. (#52-5) at 3.) A review of the affidavit as a whole, however, reveals that whether Lillard was "posing as" Rahman Johnson or not is irrelevant to a showing of probable cause. The affidavit indicates that seized during the search of room 27050 was a valet ticket for a 2006 Chrysler 300, bearing Nevada license plate 533 TJT, which was rented by Lillard in his true name. The affidavit demonstrates that Lillard was involved in the fraudulent activity, and that evidence of the criminal activity was found in rooms 26006 and 27050, both of which were tied to Lillard. Hence, it was reasonable to search the Chrysler 300 for additional evidence of Lillard's unlawful activity, even though Lillard had not in fact used the alias Rahman Johnson.

**A. The Good Faith Exception Applies**

Even if the warrant was defective, the results of the search conducted pursuant to the warrant need not be suppressed due to the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 908 (1984) ("[W]hen law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system."). "The good faith exception applies and suppression is unwarranted, unless the searching officers' reliance on the warrant was not objectively reasonable, the magistrate judge wholly abandoned his judicial role, or the officers acted in bad faith by misleading the magistrate judge." *United States v. Huggins*, 299 F.3d 1039, 1044 (9th Cir. 2002) (internal citations omitted). As discussed *supra*, although the statements in the affidavit regarding Lillard's use of the alias "Rahman Johnson" were inaccurate, there is no indication in the record that Special Agent Howell acted in bad faith or that he intended to mislead the issuing magistrate judge.

**RECOMMENDATION**

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that defendant Lillard's Motion to Suppress Illegally and Unconstitutionally Seized Evidence and Fruits of the Poisonous Tree (#52) should be denied.

DATED this 6th day of July, 2007.

*/s/ Lawrence R. Leavitt*

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**